UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HASSANE JAMAL,

       Plaintiff,                                    Case No. 09-13903
                                                      HON. BERNARD A. FRIEDMAN
vs.

DANIEL PALETKO, et al.

       Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [D.E. 27] AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [D.E. 29]**

**I.    Introduction**

Before the Court is Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. The parties have filed their respective response and reply briefs. Pursuant to E.D. Mich. LR 7.1(e)(2), the Court shall decide these motions without oral argument.

On October 2, 2009, Plaintiff Hassane Jamal filed a three count Complaint against Defendants City of Dearborn Heights ("the City") and Mayor Daniel Paletko ("Mayor"). Count I alleges age, race, religion and national origin discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 651 et seq. ("ADEA"), the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII"), and the Civil Rights Act of 1991. Count II alleges retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et. seq. ("Title VI") and Title VII. Count III alleges that Plaintiff's employment was terminated in violation of Michigan's Whistleblower's Protection Act, M.C.L. § 15.361 et. seq.

1

## II. Facts

Plaintiff is a 54 year old Arab-American Muslim man. Plaintiff alleges that he was terminated from his position with the City of Dearborn Heights ("the City") because of his faith, age, race, national origin, and because of complaints that he made regarding the conduct of certain City operations.

The Mayor hired Plaintiff as the Community and Economic Development ("CED") Director in 2004 upon his election as Mayor. The CED Director, as well as other City department heads, are at-will employees who serve at the pleasure of the Mayor. Hiring and firing decisions for these positions are made by the Mayor without City Council approval. When the Mayor hired Plaintiff, he was aware that Plaintiff is a Muslim Arab-American. Dft. Exh. 2., p. 64. Plaintiff has stated in his deposition that the Mayor was like a "brother," and that his relationship with the Mayor was one of "friendship." Dft. Exh. 2, pp. 19, 42.

Plaintiff's principal responsibilities as CED Director included managing the full-time and part-time employees; overseeing the application process for grants and ensuring grants were administered in accordance with City policy; fostering relationships in the business community; informing the Mayor of issues; and ensuring funding request deadlines were met.

Defendants state that during the first two years of his employment, Plaintiff did an adequate job with the tasks he was given. Defendants contend that in late 2007 through early 2008, Plaintiff's job performance suffered. Defendants state that the City implemented a large scale residential sidewalk replacement program in 2008, which Plaintiff was required to oversee. Defendants contend that the program was a disaster because of Plaintiff's lack of oversight, and that the Mayor received 15-20 complaints per day about the program, most of which were due to

the fact that Plaintiff and his subordinate were not returning telephone calls from residents. Defendants state that the sidewalk replacement program was incompetently administered and supervised by Plaintiff. The responsibility for the program was eventually taken away from Plaintiff, and the 2009 program was run by Carmen Oliverio, a Director of another City Department. Defendants state that the Mayor received only three complaints about the program in 2009.

In late 2008 and early 2009 Plaintiff and the Mayor had a dispute regarding the payment of repairs for the boiler at the Berwyn Center, a building owned by Plaintiff's Department. The building had been paid for by HUD, so the Mayor thought that it was appropriate for HUD to pay for the repairs. The Mayor wanted Plaintiff to find a way to pay for the repairs out of his budget, possibly with HUD funds. Plaintiff refused, claiming that the selected contractor had to be in compliance with the Davis Bacon Act ("DBA"), a federal act regarding workers' wages, and was not. Defendants state that this could have been easily remedied if Plaintiff contacted the contractors by telephone and selected the lowest bidder who would follow the DBA. Ultimately, the repairs were paid through the General Fund, rather than through HUD funds.

Defendants further state that in late January 2009, the Mayor discovered that Plaintiff failed to timely submit an application for the City to receive $1.8 million in federal funding through the Michigan State Housing Authority for the Neighborhood Stabilization Program ("NSP"). Thereafter, the Mayor removed the NSP program responsibilities from Plaintiff's control, and in March 2009 shifted those responsibilities to Krystina Kramarz, the Mayor's Administrative Assistant.

Defendants state that Plaintiff demonstrated blatant insubordination when he failed to

3

offer an NSP Program position to Zuneib Hussein, an Arab-American female in February 2009. Hussein had been a part-time employee in the Building Department, who had transferred to the CED Department, under Plaintiff's supervision. Defendants state that, at the Mayor's request, the City Council passed a resolution to create two NSP positions to take advantage of available funding, and such positions needed to be filled quickly because there was limited time to use the funds. Hussein was the Mayor's first choice for one of the positions because she was a qualified employee already working in the CED Department. Defendants state that the Mayor directed Plaintiff to hire Hussein, as Plaintiff was Hussein's immediate supervisor, but Plaintiff failed or refused to do so. By the time Defendants realized Plaintiff had not offered the position to Hussein, she had already accepted a position with the State of Michigan.

Defendants further stated that 25-30 individuals, including the other directors, city employees, members of the City's Chamber of Commerce and local business owners, told the Mayor that they did not want to work with Plaintiff.

Eventually, to minimize contact between Plaintiff and the Mayor, the Mayor ordered Plaintiff not to attend City Council or Directors Meetings. The Mayor compiled a list of 15 performance issues with the Plaintiff. Dft. Exh. 1. On June 9, 2009, the Mayor met with Plaintiff to discuss the performance issues, and presented Plaintiff with the list he had compiled. Plaintiff refused to discuss the items on the list.

The Mayor fired Plaintiff on July 6, 2009. In October 2009, the Mayor hired Ron Amen, a Muslim Arab-American, as the new CED Director. During the interim period, between the firing of Plaintiff and the hiring of Mr. Amen, Ms. Kramarz fulfilled Plaintiff's responsibilities. She currently continues to work as the Mayor's administrative assistant.

4

## III. Standard of Review

A court may grant a motion for summary judgment pursuant to Fed. R. Civ. P. 56 if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party is only required to point out "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). See Moore v. Philip Morris Co., 8 F.3d 335 (6th Cir. 1993). If the moving party meets this burden, then "the nonmoving party must go beyond the pleadings… [and] designate specific facts showing that there is a genuine issue for trial." Moore, 8 F.3d at 339-40 (citing Celotex, 477 U.S. at 324). The evidence must be weighed in the light most favorable to the non-moving party determine whether a motion for summary judgment is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Analysis

### A. "Same Actor"

As an initial argument in support of their summary judgment motion, Defendants argue that the fact that the same person who appointed Plaintiff subsequently decided to terminate his employment is inconsistent with Plaintiff's claim of age, race, religious, national origin discrimination. Defendants explain that the "same actor" inference was adopted by the 6th Circuit Court of Appeals in *Burhrmaster v. Overnite Transportation Co.*, 61 F.3d 461, 464 (6th Cir. 1995), and allows the Court "to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." Id. at 463. As the Sixth Circuit later explained, it "hardly makes sense to hire workers from a group one dislikes ... only to fire them once they are

on the job." Hartsel v. Keys 87 F.3d 795, 804 n. 9 (6th Cir.1996) (*quoting* Proud v. Stone, 945 F.2d 796, 797 (4th Cir.1991)).

The Fourth Circuit, affirming a dismissal in a "same actor" case regarding an age discrimination claim, rationalized its holding as follows:

> Our holding advances the aims of the [ADEA] statute. For almost any employer, there will be cases where an individual hired for a position does not meet the employer's expectations and a termination ensues. If former employees in these situations bring ADEA claims that are allowed to proceed to trial, employers may fear that a costly suit is possible even when there are completely legitimate reasons for a discharge. When this is coupled with the fact that individuals are far more likely to bring suits for discriminatory discharge than for discriminatory failure to hire, there is a grave risk that employers who otherwise would have no bias against older workers will now refuse to hire them in order to avoid meritless but costly ADEA actions. Courts must promptly dismiss such insubstantial claims in order to prevent the statute from becoming a cure that worsens the malady of age discrimination.

Proud v. Stone, 947 F.2d 796, 791 (4th Cir. 1991).

Similarly, the Eight Circuit, in affirming a directed verdict in defendant's favor in an age discrimination case, and upholding the "same actor" rationale used by the District Court, stated:

> The most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him. *See Proud v. Stone*, 945 F.2d 796 (4th Cir.1991). If plaintiff had been forty when he was hired, and sixty-five when he was fired, obviously this fact would not be so compelling. But here, the lapse of time was less than two years. It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.

Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 174-175 (8th Cir. 1992).

Likewise, in the present matter, Plaintiff has not offered any direct evidence of age, race, religious or national origin discrimination. Plaintiff acknowledges that he considered the Mayor to be a friend, and additional evidence demonstrates that the Mayor made concerted efforts to

6

include the City's Muslim and Arab-American community among the City's employees. Dft. Exh. 2, 3. As stated in *Lowe*, "[i]t is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the [Mayor] who hired him . . . had suddenly developed an aversion to [Muslim Arab-Americans]." Id. While the Mayor may or may not have overreacted to Plaintiff's perceived inadequacies, the question is whether Plaintiff was fired on account of his age, race, religion or national origin, not whether he was fired for an insufficient reason in some general sense.

While the Court may engage in a burden shifting analysis where appropriate, "the general rules as to the shifting burdens of production and persuasion in discrimination cases, however, are not to be applied woodenly, as if they were themselves statutory law. They are simply aids designed to make it easier to decide questions of fact about intent and motive." Lowe, 963 F.2d at 174. Here, where Plaintiff has failed to offer any evidence of direct discrimination, and the Mayor both hired and fired Plaintiff, and replaced Plaintiff with another Muslim Arab-American, the Court finds that summary judgment on Plaintiff's discrimination claims is appropriate.

      **B.**    **Prima Facie Case**

However, even if the same actor analysis was not applicable, Plaintiff has failed to demonstrate a prima facie case of discrimination.

Plaintiff may prove his employment discrimination claims with direct or circumstantial evidence. As Plaintiff has not offered any direct evidence of discrimination, his proffered circumstantial evidence is to be analyzed under the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In this framework, "the burden is first on the plaintiff to demonstrate a prima facie case of race

discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext– ie. that the employer's explanation was fabricated to conceal an illegal motive." Chen v. Dow Chem. Co., 580 F.3d 394, 400-401 (6th Cir. 2009).

For Plaintiff to establish a prima facie case of discrimination, he must demonstrate that he was either replaced by a person outside the protected class or treated differently than similarly situated, non-protected employees. White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008); Mitchell v. Vanderbilt Univ., 389 F.3d 177, 181 (6th Cir. 2004). Plaintiff has not offered evidence of either scenario.

Plaintiff has not alleged that he was treated differently than similarly situated, non-protected employees. Therefore, in order for him to establish a prima facie case of discrimination, he must demonstrate that he was replaced by a person outside of his protected class. Plaintiff was replaced by Ron Amen, a Muslim Arab-American man in his forties. While Plaintiff's responsibilities for administration of the NSP Program were initially shifted to Ms. Kramarz, a white woman, Plaintiff still remained the CED Director, with all other responsibilities and seniority, until he was fired. It is not alleged that Ms. Kramarz was promoted, given a pay increase, given a new title, or in any other way served as Plaintiff's replacement. While she briefly filled in for him following his termination, Ms. Kramarz never received a promotion or a new position between Plaintiff's firing and the hiring of Mr. Amen.

Following his firing, Plaintiff was replaced by a man with a similar race/religion/age profile as his own. Plaintiff points out that the Mayor did not hire Mr. Amen until after Plaintiff filed the instant lawsuit, contending that a reasonable jury could conclude that the Mayor's

8

hiring of Mr. Amen was an after-thought attempt to cover up the Mayor's discriminatory actions. This sort of speculation, however, does not satisfy Plaintiff's burden of demonstrating a prima facie case of discrimination. Plaintiff was fired on July 6, 2009, and his lawsuit was filed on October 2, 2009. A three month lag time between his firing and a new hiring would have been reasonable, with or without the filing of a lawsuit. The fact remains that Plaintiff's ultimate replacement was a man with similar age, religion and national origin attributes. Accordingly, Plaintiff has failed to demonstrate a prima facie case of discrimination, and the Court finds that summary judgment on Plaintiff's discrimination claims is appropriate.

   **C.**  **Plaintiff's Retaliation and Whistleblower Protection Act Claims**

Defendant seeks summary judgment on Plaintiff's Retaliation claim, and both parties seek summary judgment on Plaintiff's Michigan Whistleblower Protection Act ("WPA") claims. The WPA protects a plaintiff from discharge because he "reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule. . ." MCL 15.362. "To establish a prima facie case under this statute, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." West v. GMC, 469 Mich. 177, 183-184 (2003). Likewise, to establish a prima facie case of retaliatory discrimination, Plaintiff must prove that (1) he was engaged in a protected activity, (2) the employer knew about the activity, (3) the employer took action that was adverse to Plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. Polk v. Yellow Freight Systems, Inc., 876 F.2d 527, 531 (6th Cir. 1989).

9

"Summary disposition for the defendant is appropriate when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action. For example, in *Shallal*, the plaintiff failed to establish the necessary causal connection because she knew her discharge was imminent before the protected activity on which she based her whistleblower claim. . ." Id. at 184-185 (citing Shallal v. Catholic Social Services of Wayne Co., 455 Mich. 604, 609 (1997)). Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed. Nguyen v. City of Cleveland, 229 F.3d 559 (6ht Cir. 2000) (retaliation for claim of discrimination based on national origin); Cooper v. North Olmsted, 795 F.2d 1265 (6th Cir.1986) (retaliation for race- and sex-discrimination claims); Taylor v. Modern Engineering, Inc., 252 Mich.App. 655, 662 (2002) (retaliation for alleged whistleblower activity).

Plaintiff must show something more than merely a coincidence in time between protected activity and adverse employment action. Here, Plaintiff has satisfied that burden. Plaintiff has alleged that he advised the City that paying for the boiler repair out of HUD funds could violate the DBA, and that he believed that the hiring of Rachel Thomas violated EEO regulations and the City Charter. Plaintiff has testified that he reported or was about to report such alleged violations prior to his firing. Plaintiff's evidence of a potential causal connection between his protected activities and his firing is the Mayor's list of "concerns" given to Plaintiff at the June 8, 2009 meeting, shortly before he was fired. Pltf. Exh. 4. The list of concerns specifically mentions Plaintiff's activities regarding the replacement of the boiler and the hiring of Rachel Thomas. The Mayor testified that he was open to discussing the items on the list, and that he

10

would be open to the idea of not terminating the Plaintiff if he would agree to address his performance issues. The list of concerns creates a question of fact regarding the causation element as to whether the Mayor fired Plaintiff because of his poor performance or because of his engagement in protected activities. Such question should be resolved by a jury. Accordingly, summary judgment on these claims is not appropriate.

### D. Claims Against the Mayor

Defendants next argue that Plaintiff's claims against the Mayor must be dismissed. They argue that Plaintiff's Title VII claim must be dismissed because Congress did not intend to provide for individual employee/supervisor liability under Title VII. Defendants are correct that Title VII does not provide for individual liability. Wathen v. Gen. Elec. Co., 115 F.3d 400, 404-05 (6th Cir.1997). Plaintiff's Title VII claims against the Mayor will be dismissed.

In response, however, Plaintiff argues that the Mayor may still be individually liable for violation of the WPA. Michigan law provides for individual liability against the Mayor for violating the WPA.

In *Elezovic v. Ford Motor Co*, 472 Mich. 408 (2005), the Michigan Supreme Court interpreted the definition of "employer" and also examined individual liability under ELCRA. Its interpretation and analysis can be applied to the present case because the Michigan Court of Appeals previously determined that whistleblower statutes are analogous to antiretaliation provisions of other employment discrimination statutes, and the policies underlying these similar statutes warrant parallel treatment. Roulston v. Tendercare, Inc., 239 Mich.App 270 (2000)(the WPA bears substantial similarities to Michigan's civil rights statutes). Heckmann v. Detroit Chief of Police, 267 Mich.App 480 (2005).

Accordingly, as Michigan law permits individual liability under the WPA, Plaintiff's WPA claims against the Mayor may proceed.

## V. **Order**

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment on Count I of Plaintiff's Complaint is GRANTED.

IT IS FURTHER ORDERED Defendants' Motion for Summary Judgment on Count II is Plaintiff's Complaint is GRANTED IN PART and DENIED IN PART. Summary Judgement is granted regarding claims for individual liability against the Mayor, and denied regarding claims against the City.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment on Count III of Plaintiff's Complaint is DENIED.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Partial Summary Judgment is DENIED.

Dated: September 1, 2010         S/Bernard A. Friedman
       Detroit, Michigan         BERNARD A. FRIEDMAN
                                 UNITED STATES DISTRICT JUDGE

I hereby certify that the foregoing document was electronically filed upon counsel of record and/or by first class mail.

                                 S/Felicia Moses for Carol Mullins
                                 Case Manager